Monguee, P.,
delivered the opinion of the court.
The many controversies which have arisen in regard to the construction of Samuel Miller’s will, seem to have been settled by compromise between the parties ■concerned, with a single exception, viz: whether the 25th clause of the said will is a valid disposition of the residuum of his estate as against his heir or heirs-at-law ? That question, however, is a most important *111 one, as it involves the title to almost the whole of the immense estate of which said Miller died seized and possessed, and as upon its solution against the heir or heirs the said compromise expreásly depends. This will fully appear by reference to an act of the general assembly approved February 24,1874, entitled “an act to give effect to a compromise of the litigation in respect to the construction and effect of the will of Samuel Miller deceased, and to establish the manual labor school provided for in the twenty-fifth clause of said will.” Acts of Assembly 1873-’4, p. 52. The Circuit court of the city of Richmond decided that question against the claim of the heirs-at-law, and this appeal was taken by them, or some of them, from that decision; and thus the same question comes up for decision by this court.
In the solution of this question it is only necessary for us to decide whether the said clause is a valid disposition of the said residuum against the said heir of heirs-at-law, and not whether it is a valid disposition of said residuum in favor of the charity therein mentioned and provided for, or in favor of the Davidsons, ■the alternative or contingent residuary devisees and legatees therein named. In other words, it is not necessary for us to decide the question which was in controversy between these conflicting claimants, the charity and the Davidsons, and which is a subject of ~the compromise aforesaid. But if it shall appear to us, and we shall accordingly decide, that the said ■clause is a valid disposition of said residuum in favor of either of the said conflicting complainants, no matter which, it will then follow as a necessary consequence, that the said clause is a valid disposition of said residuum, as against the said heir or heirs-at law.
We are of opinion that the said clause is a valid *112 disposition of the said residuum in favor of the charity aforesaid, either as a devise and bequest under section 2 of chapter 80 of the Code of 1860, p. 419, or as an executory devise independently of that statute. And,
First. As a devise and bequest under the statute, the second section of which is in these words: “Every gift, grant, devise or bequest which since the second day of April in the year one thousand eight hundred and thirty-nine, has been, or at any time hereafter shall be, made for literary purposes, or for the education of white persons within this state (other than for the use of a theological seminary), whether made to a body corporate or unincorporated, or to a natural person, shall be as valid as if made to or for the benefit of a certain natural person, except,” &c.
The third and fifth sections are in the following words:
“ 3. When such gift, grant, devise or bequest is to the Board of the Literary Fund or any other corporation, or any county or natural person, the subject shall be taken and held by them respectively. If any such corporation, county or natural person refuse to take and hold, the subject shall be taken and held by trustees appointed as hereinafter directed. In either case it shall be taken and held for the' uses prescribed by the donor, grantor or testator, or such as have been prescribed in any particular case, by any law passed since the said act of the second day of April in the year 1839.”
“ 5. When any such gift, grant or will is recorded, and no trustee has been appointed, or the trustee dies, or refuses to act, the Circuit court of the county or corporation in which the trust subject, or any part thereof may be, in the case of a gift or grant, or in which the *113 will is recorded, may, on the motion of the attorney for the commonwealth in such court, (whose duty it shall be to make such motion) appoint one or more trustees to carry the same into execution. The trustees, whether appointed by such instrument, or under this section, may sue and be sued in the same manner, as if they were trustees for the benefit of a certain natural person; and for enforcing the execution of such trust, a suit may be maintained in the name of the commonwealth, when there is no other party capable of prosecuting such suit.
“ 8. In case any devise or bequest, authorized by the second section of this chapter, shall hereafter be made, the legislature, as to any such, reserves the right at any time to suspend or repeal the authority thereby given. But if in any case it shall do so, it will provide that the subject of such devise or bequest shall vest or be vested in such person, his heirs, executors or administrators, as would have been entitled had the devise or bequest not been made.”
We think the devise and bequest of the residuum in this case come within the true intent and meaning, and, indeed, within the literal terms of the statute aforesaid. The said devise and bequest were “ made for literary purposes, or for the education of white persons within this state, (other than for the use of a theological seminary).” They were made to “the Board of the Literary Bund” (a corporation created by law) and to their successors forever, “ in trust for the benefit of the county of Albemarle, in the state of Virginia, to be appropriated to the uses and purposes, and in the manner following and none others; that is to say, that the said Board of the Literary Bund shall, through the agency of the County court of the said county of Albemarle, appropriate the income and *114 Pro^s °f stocks and securities, to be purchased as aforesaid, to the founding, establishment and perpetual support of a school on the manual labor principle, on the tract of land in the county of Albemarle,” &c., “^0 suPerhrtended by a competent teacher or teachers, wherein at all times there shall be fed, clothed and instructed in all the branches of a good, plain, sound English education, the various languages, both ancient and modern, agriculture and the useful arts, and wholly free of expense to the pupils, as many poor orphan children, and other white children, whose parents shall be unable to educate them (the said orphans and other children being residents of the said county of Albemarle), as the profits and income of the funds herein devised and bequeathed will admit of or compass,” &c., &c.
The clause, among other things, further provides for erecting and keeping in good repair such buildings of brick, or other durable materials, as shall be sufficient for the comfortable accommodation of one hundred pupils and their teachers-; for the appointment, annually, by the County court of Albemarle, of two respectable, intelligent and well educated gentlemen, to act as visitors of the said school during the year, whose duty it shall be to select and employ, whenever necessary, competent and suitable teachers for the said school (subject, however, to the approval of the said County court), to visit the said school quarter-yearly, examining into its condition minutely, and make written reports thereof to the said County court; that “the school commissioners of the said county of Albemarle, if any there be, and if there be none, then the overseers of the poor of ■said county, shall, from time to time, select and designate the poor orphans and other children of the *115 description hereinbefore mentioned who shall he admitted into the said school, and shall determine the length of time they shall respectively continue there, and shall make written reports semi-annually of the said selections to the said County court:” the charges and expenses attending the establishment and support of said school, &c., “shall, when examined, allowed and certified by the said County court of Albemarle, be paid by the said board of the literary fund, out of the income and profits of the trust fund created by this clause,” &c.; and that the second auditor (who, by the act of assembly creating the said board, is constituted the accountant thereof) shall open and keep a separate account of the trust fund created by said clause, to be denominated “the Miller fund,” and make out and render annually a true and accurate account of said fund, a copy of which account, verified by his oath, shall, as soon thereafter as may be, he delivered to the Governor of the commonwealth, to be by him laid before the legislature thereof; and another copy, verified in like manner, shall be published forthwith, for one month, in certain newspapers. And the said clause contains the following provisions:
“ Should the legislature of this commonwealth pass any act or law which will defeat or prevent the carrying out of the objects and purposes of this clause, as hereinbefore declared and set forth, then, in that event, I do hereby give, devise and bequeath the trust fund created by this clause, or so much thereof as may remain unappropriated, to the children of Mary D. Davidson, hereinbefore named, to wit,” &c.
“My executors are authorized and requested, if necessary, to petition the legislature of Virginia for the passage of any laws which may be requisite for *116 more effectually carrying out the objects and purposes of-this clause in regard to the school therein men-&c.
We think that the said clause provides for the educa^011 white persons only; for although the word “ white” is not expressed, it is plainly implied, before the word “ children,” in the phrase, “ as many poor orphan children;” that phrase being immediately followed by the words, “and other white children.” Moreover, the draftsman of the will seems to have had the provisions of chapter 80 of the Code of 1860, before his eyes, or in his mind, when he drew the will, and must have known that at that time a school could not lawfully be created for the education of colored children within this state.
¥e think that the provisions in the said clause, that the school should be established on the manual labor principle; that the pupils should be fed, clothed and instructed, wholly free of expense to them; and that they should be instructed not only “in all the branches of a good, plain, sound English education, and the various languages, both ancient and modern, but also in agriculture and the useful arts;” are perfectly consistent with, and in strict pursuance of, the plain and express intent and meaning of the statute-aforesaid, in regard to the validity of a gift, grant, devise or bequest “made for literary purposes, or for the education of white persons within this state (other than for the use of a theological seminary).”
We think that the changes which have been made by the constitution'and laws of the state, or either of them, since the date of the said will, or the death of the said testator, in regard to the Board of the Literary Fund, the County court, school commissioners, overseers of the poor, and the second auditor, do not *117 at all affect the validity of the said devise and bequest for the purpose of establishing and supporting a school as aforesaid; that those agencies were merely adopted and pointed out .by the testator as convenient and appropriate means for carrying into execution his main intent to establish and support such a school; that the continued existence of those public agencies, in form or substance, as they were at the date of the will, or death of the testator, were not intended to be conditions of the said devise and bequest; but, on the contrary, it was obviously intended by the testator that if those agencies, or any of them, should cease to exist, or could not or should not perform the offices assigned to them respectively by him, for the purpose of carrying into effect his scheme of charity aforesaid, application should be made to the legislature to provide other and suitable and sufficient agencies for the purpose. That such was' his intention, seems to be clearly shown by the provision contained in the said clause as aforesaid, authorizing and requesting his executors, if necessary, to petition the legislature for the passage of any laws which may be requisite for more effectually carrying out the objects and purposes of the said clause in regard to the school therein mentioned. In conformity with the said provision, the executors petitioned for the passage of such a law, and accordingly the act aforesaid was passed, which seems to remove every difficulty which might otherwise have existed in regard to the execution of the charitable purpose of the testator, as set forth in the said clause of the will.
We do not think that the validity of the said devise and bequest is at all affected by the fourteenth amendment to the constitution of the United States. The first section of that amendment is in these words: *118 *' ^ persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. -N"° state shall make or enforce any law which shall bridge the privileges or immunities of citizens of tbe United States; nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.”
The only portion of this amendment which can have any bearing on the subject we are considering, is that which declares that “ no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.” Negroes are made citizens of the United States by the fourteenth amendment, and the question is, “ Are their privileges or immunities abridged by chapter 80 of the Code of 1860, which makes valid every gift, &c., made for the education of white persons (and not of colored persons) within this state, &c. ?
Certainly when that law was made, it did not abridge the privileges or immunities of citizens of the United States. It certainly was then valid, and continued to be so, at least until the fourteenth amendment of the constitution of the United States was adopted. Did that amendment make it invalid, and render its enforcement thereafter unconstitutional? We think clearly not. What privilege or immunity of any citizen of the United States does that law or its continued enforcement abridge? How can it injure any colored citizens of the United States, even such as reside in the state, that a gift for the education of white persons only is authorized bylaw to be made and enforced? Have such citizens any privilege or immunity in regard to gifts, &c., for their education ? *119 Is it not a question alone for the legislature to decide whether such gifts shall be valid or not, and to what extent, and for what purpose ? And if the legislature deem it proper to authorize a gift for the education of white persons only to be made and enforced, how can it benefit colored persons to have such a law declared to be void? What they need in the matter is, the enactment of a similar law as to them ; and certainly, as things now exist, there are strong reasons for such an enactment. But those reasons must be presented to the legislature and not to the courts. They have, in fact, been presented to the legislature, and with prevailing effect; for we find that by an act approved March 28, 1878, entitled “An act to amend and reenact section 2, of chapter 80 of the Code of 1860, in relation to funds from gifts, grants, devises and bequests” (Acts of 1872—’73, p. 243, chap. 265), a gift, &c., for the education of colored persons within this state, &c., is made valid. So that there is now no just ground of complaint on this score, even against the legislature, if there ever was any. But in fact there was not.
But in this case there is no person complaining that his privileges or immunities as a citizen of the United States would be abridged by an enforcement of the laws aforesaid, and that it is therefore unconstitutional. The controversy is confined to white persons, no privilege or immunity of whom can possibly be abridged by the law. In such a case a court will certainly not go out of its way to declare a law to be unconstitutional. On this subject the authorities referred to by Judge Meredith, one of the counsel of the county of Albemarle, have great force. Hoover v. Wood, 9 Ind. R. 287.
The case of Kelly &c. v. Love’s adm’rs &c., 20 Gratt. *120 is the only decision of this court in regard to the construction and effect of chapter 80 of the Code of 1860, and it has an important bearing upon this case. It was held in that case (all the judges concurring in °Pilli011 delivered by Judge Staples), that the devise there in question was void at common law upon the authority of numerous decisions of this court (which are cited), but that it was valid under chapter 80 of the Code. The charity was at least as indefinite in that case as it is in this.
Secondly. We are of opinion that the 25th clause of the will of Samuel Miller is a valid disposition of the residuum of his estate in favor of the charity aforesaid, independently of chapter 80 of the Code of 1860, and considering the said clause as an executory devise and bequest.
That this is so we think is conclusively shown by the cases of Literary Fund v. Dawson and others, 10 Leigh 147, and Literary Fund v. Dawson’s ex’or & heirs, 1 Rob. R. 402, which are like this case in all substantial respects; and we have no doubt the draftsman of the will in this case had those cases in his view as well as chapter 80 of the Code, and endeavored so to draw the 25th clause of the said will as to make it effectual, under one or the other or both of those authorities, for the establishment of the charity which the testator had so much at heart and to which he devoted the main body of his estate. The principle maintained by both of those cases is, that wherever a devise or bequest is made to a coloration, to be afterwards, within a period not too remote, created by law for the purpose of carrying into effect a charitable intention of the testator, expressed in his will, the same may be good and valid as an executory devise or bequest, and will become absolute and executed, if, and when, such. *121 a corporation shall he created accordingly. It must of necessity be created, if at all, within the period prescribed by law in regard to perpetuities; that is, within the term of a life or lives in being and twenty-one years thereafter. The same principle had before been declared and acted upon by the Supreme court of the United States in Inglis v. The Trustees of the Sailors’ Snug Harbor, 3 Peters R. 99. In that ease the residuum of the testator’s estate was given by his will to .the chancellor of the state of Hew York, &c. (naming several other persons by their official description), to have and to hold the same unto them and their respective successors in office, to the uses and trusts, &c., declared in the will; which were out of the rents, issues and profits thereof to erect and build upon the land on which he resided, which was given by the will, an asylum or marine hospital to be called “ The Sailor’s Snug Harbor,” for the purpose of maintaining and supporting aged, decrepid and worn-out sailors, &c. After giving directions as to the management of the fund by his trustees, and declaring that the institution created by his will should be perpetual, and that those officers and their successors shall forever continue the governors thereof, &c., he adds, “it is my will and desire that if it cannot legally be done according to my above intention by them, without an act of the legislature, they will, as soon as possible, apply for an act of the legislature to incorporate them for the purpose above specified,” &c. Within five years after the death of the testator, the legislature of the State of Hew York, on the application of the trustees, also named as executors of the will, passed a law constituting the persons holding the offices designated in the will, and their successors, a body corporate by the name of “ The Trustees of the *122 Sailors’ Snug Harbor,” and enabling them to execute the trusts declared in the will. This was held to be a valid devise to divest the heir of his legal estate, or, at all events, to affect the lands in his hands with the trust declared in the will.
In the cases,of Literary Fund v. Dawson &c., supra, the testator gave the residuum of his estate to be used by his executors in constituting a part of the literary fund of the state of Virginia, to be used by the school commissioners of the counties of Albemarle and JSTelson in the same way that the school fund allotted to-said counties is used, and in the proportion of two-thirds to the former and one-third to the latter county. The will contained a further provision in these words:“And from time to time, as the legislature may think advisable, the principal may be used for like objects for the benefit of the said counties, in same proportions as the interest is directed to be used. An act of assembly for said object supposed can be obtained.” A bill was filed by the heirs-at-law and next of kin of the testator, Martin Dawson, to have the said devise and bequest declared void, and the executors and the president and directors of the literary fund and others were made defendants. The court of chancery deemed the said devise and bequest to be void for the vagueness and uncertainty of the charity and of the beneficiaries thereof. From the decree the president and directors of the literary fund obtained an appeal; and upon the appeal, this court, 10 Leigh 147, reversed the decree. Tucker, P., being of opinion, that the will was equivalent to a devise of the testator’s real and personal estate to the executors in trust for the purpose of procuring an act of assembly with the necessary provisions for constituting the funds devised a part of the literary fund, in strict conformity *123 with the terms, provisions and conditions of the will; that by such an act of assembly all the difficulties suggested by counsel would be avoided, and the benevolent intentions of the testator carried into complete effect; that as this act was to be obtained by the executors, the contingency of its passage was within a life or lives in being, and therefore not too remote; and that the case was very much the same with that of the Sailors’ Snug Harbor, 3 Peters R. 99.
An act of assembly was accordingly passed March 10, 1841, entitled “ an act concerning the estate of Martin Dawson, deceased, and for other purposes.” Acts of Assembly 1840-’41, chap. 26, p. 52. This act was passed on the petition of the president and directors of the literary fund. Under this act the said president and directors filed their bill against the executor and heirs of said Martin Dawson, to recover the said residuum and its profits. The executor filed an answer, in which he claimed that he was the only person in the universe authorized or capable to take the steps necessary to carry the testator’s designs into effect, that is, to obtain the act of assembly requisite for the purpose. The adult heirs-at-law demurred to the bill. The court of chancery, upon the said demurrer of the heirs and answer of the executor, dismissed the bill with costs. Prom this decree also the president and directors of the literary fund obtained an appeal; and upon the appeal this court, in 1 Rob. R. 402, reversed the decree. This case, as well as the other, in 10 Leigh, was argued with very great ability by very able counsel. Judges Allen and Baldwin, in their several opinions delivered in the case, fully sustain the validity of the residuary devise and bequest for the purpose of the charity. One great question in the case was, whether the testator did not refer to the exeeu *124 ^ors a^one question, whether an application should. be made to the legislature for the contemplated act, and devolve on them the duty of making it if they thought fit to do so. But the court considered that great and chief intent of the testator was to estab]ish the charity, and that the means which he marked out for that purpose were entirely subordinate to the main intent, and must give way to other and more suitable means that might be provided for the purpose by the legislature if necessary. “ The question now before the court,” said Judge Baldwin, “is simply and exclusively whether the contingency has occurred upon which the trust for the literary fund, created by the will, and engrafted upon the devise to the executors, was to take effect. To determine this, we must, of course, look to the nature of the contingency; and that must depend altogether upon the intent of the testator. He had resolved to establish a charity, to be administered by the president and directors of the literary fund, through the agency of the school commissioners; and that resolution was fixed and final, so far as he and his representatives were concerned. But it required for its accomplishment the concurrence of another will, that of the legislature; and it required nothing more. Itwas wholly immaterial whether such concurrence was granted with or without solicitation, whether upon or without the application of the trustee or cestui que trust, whether at the suggestion of a member of the legislature or a stranger, whether as an act of grace or favor on the part of the government, or of public duty as the representative of a great public interest.” P. 419. “ The general and leading intention,” said Judge Allen, “to dedicate this estate to the purposes of education within the counties of Albemarle and Nelson, is clearly established. As re *125 garded his rllations, he had made such provision for them before as he thought proper. His first and favorite scheme is. developed in the sixteenth section. But he seems to have apprehended that difficulties might obstruct its execution. He looked to the possibility of its failure; and to provide for that gency, and ensure an application of this estate to the leading intention of his will, he made the devise contained in the seventeenth clause. Is there anything which indicates an intention to confide this matter to the discretion of the executors; to leave it to their judgment, whether this leading intention should or should not be carried into effect?” P. 425. “The testator no doubt had confidence in the good faith of his executors, and did not contemplate any failure on their part to perform the trust confided to them. He intended that they should apply for the act. An act was necessary to effectuate the end he had in view, and an application by his executors the means of obtaining it. But if they refuse to apply, and the end is attained in another mode, is the whole will to be defeated because this particular intent fails ?” P. 427. And the same judge quoted .with approbation from the case in 3 Peters 117 the words, that “where the court can see a general intent consistent with the rules of law, it is to be carried into effect, though the particular intent shall fail.”
We cannot fail to see how strikingly appropriate are these cases decided by this court, and what was said by the judges in them, to the case we now have under consideration. In this case the general intent of the testator was to devote the bulk of his great estate to the creation and perpetual support of a school upon the manual-labor principle, in his native county of Albemarle, for the education of poor oi’phan *126 an<^ otber white children, residents of said county, whose parents should be unable to educate them. He had and expressed many particular intents in regard to the mode of effecting his general intent. He pointed 0U^ su°b public agencies then existing as, in his opinion, would be most likely to carry out his views. But he knew that those agencies were liable to continual change; and he actually provided for a particular change, which he seemed to anticipate might take place. And he certainly could not have intended that a change of any or all of those agencies should have the effect of defeating his general intent. He relied on the legislature to supply suitable means to take the place of those which he had marked out, but which it might destroy. And he therefore expressly provided in the 25th clause of his will that “ my executors are authorized and requested, if necessary, to petition the legislature of Virginia for the passage of any laws which may be requisite for more effectually carrying out the objects and purposes of this clause in regard to the school therein mentioned.” This petition was to .be made by the executors, as in the case of Dawson’s will, and of course the legislation contemplated was to be within the period prescribed by law for a good executory devise. The acting executor in this case did, in a reasonable time petition for such legislation as he was advised was necessary, and as the court below decided to be necessary, to effectuate the intention of the testator; and accordingly the act was passed which has been before referred to, and which seems fully to supply the necessary means for that purpose. But, if it should be found that it does not, the deficiency can at any time be provided for by additional legislation.
This testator, after providing bountifully for all *127 those who seemed to' have any claims upon him, devoted the most of his immense estate, the fruit of a long life of labor and toil and self-denial, to the endowment of a school for the education of orphan and other poor white children of his native county of Albemarle. Few men ever did more for their native counties than did this testator, by this act, for his. He has conferred on it the best of all boons, the means of securing a good education to all its poor. May we not hope that all the benefits which he anticipated will be realized from his bounty. The matter rests with the legislature, and with the agents whom it has entrusted, and may hereafter entrust with the administration of this great charity. Fidelity on their part, seems to be all that is necessary to make it productive of the greatest possible good to those for whose good it was intended.
We are therefore of opinion, in any view of the case, that the 25th clause of the will of the said Samuel Miller is a valid disposition of the residuum of his estate as against his heir or heirs-at-law; that there is no error in the decree appealed from; and, without deciding any other question arising in the cause (it being unnecessary to do so), that the said decree ought to be affirmed.
The decree was as follows:
This day came again the parties by their counsel, and the court having maturely considered the transcript of the record of the decree aforesaid and the arguments of counsel, and also a copy (filed with the record in this cause) of an act of the general assembly approved February 24, 1874, entitled “ an act to give effect to a compromise of the litigation in respect to the construction and effect of the will of Samuel Miller deceased, *128 and to establish the manual labor school provided for in the twenty-fifth clause of said will,” is of opinion and doth decide and determine, that the twenty-fifth clause of the will of said Samuel Miller deceased is a valid disposition of the residuum of his estate as against his heir or heirs-at-law. Therefore, without deciding any other question arising in the cause (it being unnecessary to do so), the court is of opinion that there is no error in the decree appealed from in this cause, and it is decreed and ordered that the said decree be affirmed, and that the appellants pay to the appellees thirty dollars damages, and their costs by them about their defense in this behalf expended.
"Which is ordered to be certified to the said Circuit court of the city of Richmond.
Decree aeeirmed.